THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                    Mailed:
March 2, 2011                               October 25, 2011

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Country Music Association, Inc.
_____

Serial Nos. 78906900 and 78901341
_____

Robert A. Rosenbloum and Kristen L. Fancher of the law firm
Greenberg Traurig, and Miles J. Alexander, Jerre B. Swann,
William H. Brewster, and Charlene Marino of the law firm
Kilpatrick Stockton, LLP for Country Music Association, Inc.

Jeffrey C. Coward, Trademark Examining Attorney, Law Office 101
(Mary I. Sparrow, Managing Attorney).
_____

Before Seeherman, Cataldo, and Lykos, Administrative Trademark
Judges.

Opinion by Lykos, Administrative Trademark Judge:

Country Music Association, Inc. ("applicant") filed an

application to register COUNTRY MUSIC ASSOCIATION as a mark for

"association services, namely, promoting country music, and

promoting the interests of country music entertainers and the

country music recording industry" in International Class 35.[1]

Applicant seeks to register the mark pursuant to Section 2(f) of

---

[1] Application Serial No. 78906900, filed June 13, 2006, alleging
September 1958 as the date of first use anywhere and in commerce.
Applicant amended the recitation of services during the course of
examination.

the Trademark Act, 15 U.S.C. § 1052(f), asserting that it has acquired distinctiveness as a mark. Applicant has appealed the examining attorney's final refusal to register the mark on the Principal Register pursuant to Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the grounds that it is generic for the identified services or, alternatively, that applicant's mark is merely descriptive, and that applicant has failed to present sufficient evidence to show acquired distinctiveness thereby making the mark registrable pursuant to Section 2(f).

Applicant also applied to register the mark displayed below



for the identical services noted above for registration on the Principal Register pursuant to Section 2(f).[2] In response to the examining attorney's requirement for a disclaimer of COUNTRY MUSIC ASSOCIATION, applicant asserted a claim of acquired distinctiveness as to this phrase. Registration has been finally refused in light of applicant's failure to comply with

---

[2] Application Serial No. 78901341, filed June 6, 2006, alleging 1963 as the date of first use anywhere and in commerce. During ex parte prosecution, applicant amended the application to seek registration pursuant to Section 2(f).

the examining attorney's requirement for a disclaimer of the phrase "COUNTRY MUSIC ASSOCIATION" pursuant to Trademark Act § 6(a), 15 U.S.C. § 1056(a), on the grounds that the phrase is generic for applicant's services.

Applicant has appealed the examining attorney's final refusal to register both applications. Both applicant and the examining attorney have filed briefs,[3] and an oral hearing was held. Because we deem the cases to have common questions of fact and of law, and the records are largely identical, we have consolidated the appeals. For the reasons explained below, we reverse the refusals to register both applications.

I.  *Application Serial No. 78906900*

A.  *Genericness Refusal*

As a preliminary matter, we note that insofar as applicant seeks registration of the mark COUNTRY MUSIC ASSOCIATION on the Principal Register pursuant to Section 2(f), applicant has effectively conceded that the mark is, at a minimum, descriptive. *See The Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 ("where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on

---

[3] Applicant filed the identical brief in both cases, which did not specifically address the refusal based on the disclaimer requirement.

Section 2(f) during prosecution presumes that the mark is descriptive.").

Now we turn to our genericness analysis.  A mark is a generic name if it refers to the class or category of goods and/or services on or in connection with which it is used.  *In re Dial-A-Mattress Operating Corp.,* 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001), *citing H. Marvin Ginn Corp. v. International Association of Fire Chiefs, Inc.,* 782 F.2d 987, 228 USPQ 528 (Fed. Cir. 1986)("*Marvin Ginn*").  The test for determining whether a mark is generic is its primary significance to the relevant public.  Section 14(3) of the Trademark Act; *In re American Fertility Society,* 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); *Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991); and *H. Marvin Ginn, supra.*

The United States Patent and Trademark Office (USPTO) has the burden of establishing by clear evidence that a mark is generic and, thus, unregistrable.  *In re Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 828 F.2d 1567, 4 USPQ2d 1141 (Fed. Cir. 1987).  *See also In re American Fertility Society, supra*; and *Magic Wand Inc. v. RDB Inc., supra*.  "Doubt on the issue of genericness is resolved in favor of the applicant."  *In re DNI Holdings Ltd.,* 77 USPQ2d 1435, 1437 (TTAB 2005).

Our first task under *Marvin Ginn* is to determine, based on the evidence of record, the genus of applicant's services. The examining attorney maintains that the proper genus of services is "association services related to country music." Examining Attorney's Brief, p. 6. Applicant, however, maintains that the examining attorney has defined the genus so narrowly that in effect "any type of association would be generic for the subject matter of the services." Office Action Response dated February 13, 2008. Hence, applicant takes the position that the proper genus of services is the broad category of "association services." Applicant's Brief, p. 6.

In order to resolve this issue, we find instructive both the recitation of services set forth in the application and applicant's own submissions describing its services. *See Magic Wand Inc. v. RDB Inc.,* 940 F.2d 638, 19 USPQ2d at 1552 ("[A] proper genericness inquiry focuses on the description of [goods or] services set forth in the [application or] certificate of registration.").

We find that the genus of services at issue in this case is adequately defined by applicant's recitation of services, specifically, "association services, namely, promoting country music, and promoting the interests of country music entertainers and the country music recording industry." *See e.g. In re Trek 2000 Int'l Ltd.,* 97 USPQ2d 1106, 1112 (TTAB 2010) ("the genus of

goods at issue in this case is adequately defined by applicant's identification of goods…"). This is confirmed by applicant's specimen of use (an excerpt from its web site), describing applicant's services as "[t]he first trade organization to ever promote a type of music…. As a professional trade association, CMA membership is available to those working in the Country Music industry."

Next, we must determine whether the designation COUNTRY MUSIC ASSOCIATION is understood by the relevant purchasing public primarily to refer to that genus of services. Our first task is to define the "relevant purchasing public." Initially, the examining attorney took the position that the relevant purchasing public was "all users of the global internet." The examining attorney has retreated from this position, and now maintains that the relevant purchasing public in this case consists of "people that listen to and/or are in some way involved with country music." Examining Attorney's Appeal Brief, unnumbered p. 6. Applicant affirmatively stated in its reply brief that it accepts the examining attorney's new position regarding the proper definition of the "relevant purchasing public" in this case. The Board agrees. The record evidence in this case supports a finding that the relevant purchasing public consists of the general public who listen to

country music and those who are associated with the country music industry.

With this in mind, we must now ascertain whether the designation COUNTRY MUSIC ASSOCIATION is understood by the relevant purchasing public as primarily referring to association services which promote country music and the interests of professionals in the country music recording industry. Applicant and the examining attorney do not dispute that the mark COUNTRY MUSIC ASSOCIATION is a phrase and should be analyzed according to the test set forth in the case of *In re American Fertility Society, supra*, and further clarified in the case of *In re Dial-A-Mattress Operating Corp., supra*, 57 USPQ2d at 1810:

> [W]here the proposed mark is a phrase (such as "Society for Reproductive Medicine"), the board "cannot simply cite definitions and generic uses of the constituent terms of a mark"; it must conduct an inquiry into "the meaning of the disputed phrase as a whole." *In re The Am. Fertility Soc'y,* 188 F.3d at 1347, 51 USPQ2d at 1836.

By way of illustration, the Federal Circuit provided the following example in *In re American Fertility Society*:

> AMERICAN BAR ASSOCIATION is certainly an apt name for a national association of lawyers; however, it is not used as a generic name for national associations of lawyers (see, e.g., NATIONAL ASSOCIATION OF WOMEN LAWYERS; FEDERAL BAR ASSOCIATION; AMERICAN HEALTH LAWYERS ASSOCIATION; NATIONAL LAWYERS ASSOCIATION).

*Id.* at 1836.

We turn now to the evidence of record. Competent sources to show the relevant purchasing public's understanding of a contested term include purchaser testimony, consumer surveys, dictionary definitions, trade journals, newspapers and other publications. *In re Dial-A-Mattress Operating Corp., supra; In re Bed & Breakfast Registry,* 791 F.2d 157, 160, 229 USPQ 818, 819 (Fed. Cir. 1986).

To support the position that applicant's applied-for term is generic, the examining attorney argues that there are numerous "country music associations" throughout the United States. The examining attorney relies on third-party usages of the designation "country music association" preceded by either a descriptive, geographical, or other term obtained from various third-party Internet websites as well as corporate and business listings from the LEXIS/NEXIS database. Some examples include:

1) The Lesbian and Gay Country Music Association;
2) Christian Country Music Association;
3) New York Metropolitan Country Music Association;
4) New Hampshire Country Music Association;
5) Pine Tree State Country Music Association;
6) Long Island Country Music Association;
7) NorthEast Country Music Association;
8) Young Guns Country Music Association;
9) Heart of Texas Country Music Association;
10) Greater Southern Country Music Association;
11) Utah Old Time Fiddlers & Country Music Association;
12) Missouri Traditional Country Music Association;
13) Florida Country Music Association of Aluchua County;
14) Tennessee Country Music Association;
15) Kentucky Country Music Association;

16) Mobile Country Music Association;
17) Colorado Country Music Association;
18) Virginia Country Music Association;
19) Georgia Country Music Association;
20) North American Country Music Association International;
21) Central Wisconsin Country Music Association;
22) Country Music Association;
23) Garden City Country Music Association;
24) Texas Country Music Association;
25) Missouri Fiddlers & Country Music Association;
26) National Traditional Country Music Association;
27) Illinois Country Music Association;
28) Country Music Association of Rhode Island.

The examining attorney contends that unlike the evidence presented in *In re American Fertility Society, supra,* the evidence here of use of the unitary phrase "country music association" establishes the generic nature of applicant's mark.

As a threshold matter, we will address applicant's objection that Internet evidence submitted by the examining attorney obtained from third-party websites is not a competent source to prove genericness. Applicant's arguments are based on its interpretation of the Board's prior case law, including *In re Tea & Sympathy, Inc.,* 88 USPQ2d 1062, 1064 n.3 (TTAB 2008).

Applicant is mistaken that such evidence is, per se, not probative. We agree with the examining attorney that applicant mischaracterizes the holding in the case of *In re Tea*. In that case, the Board found that the examining attorney's evidence of truncated Google® search results for the search "pharmacy herbs" to be of "little probative weight." By contrast, here the

Internet evidence submitted by the examining attorney does not consist of truncated Internet search engine results but rather includes printouts of the web pages from each website.

To further rebut the examining attorney's evidence, applicant argues that many of these third-party associations either never existed or no longer exist. This argument is based on applicant's inability to locate a telephone number or website address for them. In addition, applicant criticizes the remainder of the third-party designations submitted by the examining attorney on the grounds that the websites are "obscure" and not in general circulation. More specifically, applicant asserts that traffic on the websites is de minimis based on usage statistics obtained from the www.alexa.com website. Applicant therefore maintains that the evidence is of limited probative value given the lack of evidence that the groups are widely known to the public.

Considered in the context of the record as a whole in this case, the examining attorney's evidence of third-party use of the phrase "Country Music Association" does not clearly establish genericness. We note that all of the Internet and LEXIS/NEXIS excerpts show the phrase "Country Music Association" in initial capitalization form, which, as discussed further below, may be indicative of use as a trade or brand name. In addition, the evidence shows that third-party organizations use

10

the term "Country Music Association" in combination with other descriptive, geographic, or other terms to designate the name of their respective organizations. Taking into account these points and the evidence presented by applicant which is discussed below, we are not convinced that the examining attorney's evidence of use of the phrase "Country Music Association" suffices as clear evidence that the relevant purchasers perceive the phrase as naming the genus of the services at issue. We are left with doubt on the issue and find the evidence to be equally compatible with a conclusion that the phrase is not the name of a genus of services but merely an apt name for an association comprised of country music professionals or promoting the country music industry. *Cf. In re American Fertility Society,* 51 USPQ2d at 1836 ("AMERICAN BAR ASSOCIATION is certainly an apt name for a national association of lawyers").

We also find some merit in applicant's argument that the examining attorney's Internet evidence of third-party usages are relatively obscure. *Cf. Carl Karcher Enterprises Inc. v. Stars Restaurants Corp.,* 35 USPQ2d 1125, 1131 (TTAB 1995) (applicant's evidence of third-party use of "star" word and design marks in the restaurant field was of limited probative value due to small, local nature of operations and geographic obscurity). To measure the level of exposure of each Internet usage, applicant

has used the Alexa.com website to calculate the number of daily visitors and page views.  *See* Declaration of Charlene R. Marino, ¶¶ 28-39, filed September 3, 2009.  Based on this data, applicant concludes that the level of usage is relatively small for each web site.  The examining attorney disputes this conclusion, pointing to the Gay & Lesbian Country Music Association site showing over 39,000 hits as of November 10, 2006 as an illustration.  The examining attorney further asserts that even if the average number of hits for each web site totaled only 1000, the cumulative usage of the wording by third parties is not de minimis.  By comparison, however, applicant's own web site received 15 million hits in 2007 alone. Declaration of Tammy Genovese, Chief Executive Officer of applicant ("Genovese Declaration"), ¶ 8 attached to response filed February 13, 2008.  On balance, we find that the data obtained from the www.Alexa.com web site measuring Internet traffic confirms the comparatively obscure nature of the third-party usages.  This is not to say that a website that receives only hundreds or thousands of hits necessarily renders it obscure or of limited probative value.  Rather, on this record, the comparative obscurity of the third-party uses raises doubt about whether the relevant public will perceive the phrase as generic or as an element of various trade names.

Further controverting the examining attorney's evidence of genericness, applicant has submitted two reports prepared by Dr. David K. Barnhart, a professional linguist and lexicographer, the first consisting of a review of dictionary usage and the second consisting of a review of written language usage regarding the public's understanding of the term COUNTRY MUSIC ASSOCIATION. *See* Declaration of Dr. David K. Barnhart, Appendix A, Response to Request for Reconsideration filed January 9, 2009.

Dr. Barnhart asserts, with respect to his review of dictionary usage, that the term "association" denotes "a particular or proper or proprietary group." Based on the dictionary definitions of the terms "country," "country music," and the inclusion of these terms prior to the word "association," Dr. Barnhart maintains that consumers would perceive the phrase "country music association" as a brand name. In his brief, the examining attorney criticizes Dr. Barnhart's conclusions, arguing that any wording added to the word "association" does not result in a registrable mark.

We agree with the examining attorney that Dr. Barnhart's reasoning is flawed. First, we find his premise that the word "association" per se denotes a proprietary group faulty. Nothing in the dictionary definitions of "association" considered by Dr. Barnhart suggests that the term is a brand or

13

proprietary name. By way of illustration, the word "association" in the *American Heritage Dictionary* is defined as "an organized body of people who have an interest, activity or purpose in common; a society." To then reach the conclusion that because applicant's mark includes the term "association," it must be a brand name, is devoid of foundation. As such, we deem the conclusions reached by Dr. Barnhart based on his review of dictionary usage to be of little or no probative value.

Next, we consider Dr. Barnhart's second report of written language. The sources he examined consist of the Historical New York Times databank, LEXIS/NEXIS database, and the USPTO database of registered marks.

First we consider the results of his review of the Historical New York Times databank. He found that the first time "country music association" appeared in print was 1961, and that this reference referred to applicant. We find nothing in the record to contradict this conclusion.

With regard to his review of the LEXIS/NEXIS database, he found 27,919 articles which contain the phrase "country music association." Of those 27,919 articles, he first examined a sample of 133 articles and found that 99% of the printed use of the phrase "country music association" appeared in initial capital format, the standard method for indicating trademark significance. He then also reviewed a second sample of 185

articles and found that 99% of the printed uses of the phrase "country music association" appeared in initial all capital letters.  He also noted that when the term "country music" was combined with other nouns, such as "performer" or "industry," they appeared in lower case format.  Based on the above information, Dr. Barnhart reached the conclusion that the term COUNTRY MUSIC ASSOCIATION was initially used as a trademark referring to applicant, and that virtually all printed uses of the term consist of trademark usage by applicant or refer to applicant.

The examining attorney in his brief is critical of the conclusions reached by Dr. Barnhart, arguing that although capitalization of the initial letter of each word may indicate an intent to use the phrase as a mark, it does not necessarily follow that the phrase functions as a trademark.

We agree with Dr. Barnhart's assumption that in the English language, initial capitalization of a term or phrase is generally used to designate a brand name, as opposed to a generic term.  Since almost all usages of COUNTRY MUSIC ASSOCIATION were in initial capitalization form, we find that this portion of his report weighs in applicant's favor.

As to the third portion of his written language report, Dr. Barnhart reviewed the USPTO database for marks containing the term "association."  He concluded that the term ASSOCIATION is

an integral component in proprietary or brand names in marks such as "AMERICAN AUTOMOBILE ASSOCIATION," and that, by logical extension, applicant's mark constitutes a brand name. Barnhart Declaration, p. 5. The examining attorney, however, contends that these third-party registrations are of no value because prior actions of other examining attorneys have no bearing in this case.

We are not persuaded by the examining attorney's position. While the third-party registrations do not constitute evidence of use or public familiarity of the marks shown therein, at the very least they do demonstrate that trademark owners view the term ASSOCIATION as part of their marks. We therefore accord some weight to this portion of Dr. Barnhart's written language report.

Applicant also submitted a "Teflon" type consumer survey[4] conducted by Dr. Gerald L. Ford, a partner in the marketing research and consulting firm of Ford Bubala & Associates in Huntington Beach, California, targeted to listeners of country music, or as applicant asserts, the "consumers of applicant's efforts to promote country music as an art form." Applicant's Brief, p. 16. *See In re Hotels.com L.P.,* 87 USPQ2d 1100, 1109

---

[4] *See E.I. du Pont de Nemours and Company v. Yoshida International, Inc., et.al.,* 393 F.Supp. 502, 185 USPQ 597 (E.D.N.Y. 1975), for the description of "Teflon" consumer survey methodology.

16

(TTAB 2008) (applicant submitted "Teflon" type survey in an attempt to show consumer recognition of HOTELS.COM as a brand name).  The stated objective of the survey was to measure the relevant public's understanding of the significance of the term COUNTRY MUSIC ASSOCIATION.  Ford Declaration, ¶ 2.  The survey sample was based on a random digit probability sample of computer-generated phone numbers derived from all working telephones in the continental United States and based on a representative sample of the U.S. population.  Using a double-blind protocol, the interviewers screened for qualified survey respondents who consisted of males and females at least 18 years of age who listened to country western music.  The interviewer explained to the qualified survey respondents the conceptual distinction between a "brand or proprietary name" and "common name" using the following example:  "By brand or proprietary name, I mean a name like 'Bank of America' which is used by one company or organization; by a 'common name' I mean a name like 'safe deposit box' which is used by a number of different companies or organizations.  Ford Declaration, ¶ 14. Respondents were then asked two questions to test their ability to distinguish brand or proprietary names from common names: (1) Do you understand the name "National Football League" to be a brand or proprietary name or common term?  (2) Do you understand the name "high school football" to be a brand or

proprietary name or common term?  One hundred persons were deemed qualified and interviewed after completion of the screening process.  These qualified respondents were then given a list of terms and asked whether they were brand or common names.

In one cell, respondents were asked whether the following ten terms were brand or common names.  The results represented in percentages were as follows:

|  | Brand Name | Common Name | Don't Know | Both |
|---|---|---|---|---|
| STP | 74 | 6 | 19 | 1 |
| Coke | 92 | 7 | -- | 1 |
| Jello | 66 | 30 | 1 | 3 |
| Refrigerator | 9 | 91 | -- | -- |
| Margarine | 12 | 86 | 2 | -- |
| American Airlines | 94 | 5 | 1 | -- |
| Gas Station | 6 | 94 | -- | -- |
| National Rifle Association | 93 | 4 | 2 | 1 |
| Alumni Association | 23 | 74 | 3 | -- |

In the second cell, respondents were asked, with regard to music, whether the following were understood to be the name of a brand or proprietary name used by one company or organization or a common name used by a number of different companies or

18

organizations. The results represented in percentages were as follows:

|  | Brand Name | Common Name | Don't Know | Both |
|---|---|---|---|---|
| Country Music Association | 85 | 10 | 5 | -- |
| iTunes | 86 | 3 | 11 | -- |
| Bluegrass | 15 | 77 | 8 | -- |

A significant number of surveyed respondents, 85%, answered that COUNTRY MUSIC ASSOCIATION is a brand name. Based on the survey results, Dr. Ford concluded that the term "country music association" is perceived by listeners of country western music as a proprietary or brand name, and not a generic term.

The examining attorney questions Dr. Ford's interpretation of the survey results. First, he argues that the survey respondents' recognition of the wording "country music association" as a brand name does not mean that the mark is not generic but rather is the result of applicant's extensive promotion of its mark.[5] Second, the examining attorney maintains that it is impossible to distinguish whether the survey results

---

[5] The examining attorney's assertion is incorrect. Extensive promotion of a mark that results in acquired distinctiveness is evidence that may be considered with regard to the genericness inquiry. *See e.g., In re Minnetonka Inc.,* 3 USPQ2d 1711 (TTAB 1987).

reflect respondent's recognition of applicant's mark as a brand name for applicant's association services or for applicant's annual televised award program.

As a threshold matter, we find that the methodology used in Dr. Ford's survey to be sound.  Similar to the *Teflon* survey, the respondents were capable of distinguishing between brand and common names.  In addition, the interviewers presented to respondents brand and common names which are similar to the mark at issue here such as "National Rifle Association" and "Alumni Association" in testing the respondent's ability to distinguish such names.  According to the survey results, the majority of listeners of country western music, members of the relevant public in this case, identified COUNTRY MUSIC ASSOCIATION as a brand name as opposed to a common or generic designation.  We therefore find that Dr. Ford's survey has probative value in applicant's favor.

As noted earlier, the Office bears the burden of proof and genericness must be shown by clear evidence.  Genericness is a fact-intensive determination and the Board's conclusion must be governed by the record which is presented to it.  On balance we find that the Office has not met its burden of establishing by clear evidence that the designation COUNTRY MUSIC ASSOCIATION, as a whole, is generic for the genus association services which

promote country music and the interests of professionals working in the country music recording industry.

Furthermore, any doubts must be resolved in applicant's favor. *Id.* Both the results of Dr. Ford's survey showing that a significant percentage of respondents who listen to country western music identify applicant's mark as a brand name and Dr. Barnhart's survey results showing that virtually all sampled written usages of the phrase COUNTRY MUSIC ASSOCIATION refer to applicant are sufficient to raise doubts regarding the genericness of applicant's mark. *See e.g. In re Merrill Lynch, Pierce, Fenner, and Smith Inc.,* 4 USPQ2d at 1143 (Federal Circuit reversed decision by the Board that the term CASH MANAGEMENT ACCOUNT was generic; "[t]he evidence before the Board showed recognition in a substantial number of publications that the source of the CASH MANAGEMENT ACCOUNT was the appellant.")

Thus, based on the entirety of the record before us, we have substantial doubt about whether COUNTRY MUSIC ASSOCIATION is perceived by the relevant public as a generic name for those services. Such doubt must be resolved in applicant's favor and in favor of publication of the involved marks for opposition, if

the phrase COUNTRY MUSIC ASSOCIATION be merely descriptive and possessed of acquired distinctiveness.[6]

However, we do find that the term ASSOCIATION is a generic designation for applicant's association services.  As shown by the dictionary definitions that are of record, the word "association" is defined as:

>     A group of people or organizations joined together for a purpose.  *msn.encarta*

>     An organization of persons having a common interest. *Merriam-Webster Online.*

>     A group of people who are united in a single organization for a particular purpose.  *Cambridge Online*.

>     Applicant's specimen of use (an excerpt from its web site)

describes applicant's services as follows:

>     As the first trade organization ever to promote a type of music, CMA's membership has grown to more than 5,500 music industry professionals and companies from 38 countries around the world. …
>     As a professional trade association, CMA membership is available to those working in the Country Music industry.  More than 20 types of membership are offered for every category of industry professional, from behind-the-scenes studio engineers, to front-of-camera artists.

The following excerpt from applicant's web site further explains the nature of applicant's services:

>     Founded in 1958, the Country Music Association was the first trade organization formed to promote a type of

---

[6] In an inter partes proceeding, based on a different record, ultimate resolution of the question of genericness might be different, but we are limited to consideration of the record before us.

> music. CMA, originally consisting of only 233
> members, now has more than 6,000 organizational and
> individual members in 41 countries. The objectives of
> the organization are to guide and enhance the
> development of Country Music throughout the world; to
> demonstrate it as a viable medium to advertisers,
> consumers and media; and to provide a unity of purpose
> for the Country Music industry. …
>
> Originally there were nine individual membership
> categories. The current 15 categories represent all
> facets of the music industry. Organizational
> memberships are also available. CMA membership is
> composed of those persons or organizations that are
> involved in Country Music, directly and substantially.

Declaration of Kristen Fancher, counsel for applicant, dated May 14, 2007, Exhibit 2.

In addition, applicant, in the context of arguing that its mark is merely descriptive and not generic, made of record 31 third-party registrations that issued either on the Principal Register under Section 2(f) or on the Supplemental Register for marks containing the word ASSOCIATION for various types of association services (*e.g.* HEDGE FUND ASSOCATION, COIN LAUNDRY ASSOCIATION, NATURAL PRODUCTS ASSOCIATION). *See* Applicant's Office Action Response filed February 13, 2008. Of the 31 registrations, only 5 did not include a disclaimer of the word ASSOCIATION, and two of those marks began with the phrase "ASSOCIATION FOR" or "ASSOCIATION OF." Thus, the third-party registrations show the Office's consistent treatment of the word "association" as a generic term when used in connection with

association services such as those identified in applicant's application.

These dictionary definitions, coupled with the excerpts from applicant's specimens and website describing the nature of applicant's services, as well as the third-party registrations noted above, are sufficient to establish that the relevant public would view ASSOCIATION as used in applicant's mark as a generic term denoting association services.  As such, the refusal of registration on the basis of genericness is affirmed solely with respect to the word ASSOCIATION.

B.  *Acquired Distinctiveness*

Although we have found that COUNTRY MUSIC ASSOCIATION is not generic, we must consider whether it is prohibited from registration on the ground that it is merely descriptive of applicant's identified services.  Applicant has admitted that the words are merely descriptive by seeking registration pursuant to Section 2(f).  Therefore, we now turn to the question of whether applicant's mark, COUNTRY MUSIC ASSOCIATION, has acquired distinctiveness under Section 2(f).  In his brief, the examining attorney did not present any arguments in the alternative regarding the sufficiency of the evidence submitted in support of applicant's claim of acquired distinctiveness. Rather, he merely asserts that because applicant's mark is generic, "no amount of purported proof that a generic term has

acquired secondary meaning can transform that term into a registrable trademark" and therefore "the quality and quantity of evidence simply does not matter in this case." We interpret the examining attorney's silence on this issue as a concession that, if the term is not generic, the record evidence is sufficient to show acquired distinctiveness under Section 2(f). *Cf.* TMEP § 1209.02(b) ("If the examining attorney fails to separately address the sufficiency of the §2(f) evidence, this may be treated as a concession that the evidence would be sufficient to establish distinctiveness if the mark is ultimately found not to be generic.").

That being said, we acknowledge the principles that applicant has the burden of establishing that its mark has become distinctive, and that the more descriptive the term, the greater the evidentiary burden to establish acquired distinctiveness.[7] *See Yamaha International Corp. v. Hoshino Gakki Co. Ltd.,* 840 F.2d 1572, 6 USPQ2d 1001, 1006 (Fed. Cir. 1988); *In re Bongrain International (American) Corp.,* 894 F.2d 1316, 13 USPQ2d 1727 (Fed. Cir. 1990). Having carefully reviewed the evidence of record, we find that applicant's evidence of acquired distinctiveness is sufficient to establish a prima facie showing thereof.

---

[7] Despite the examining attorney's effective concession of the issue, we must make our own assessment of applicant's evidence.

At the outset, we note applicant's continuous use of the mark COUNTRY MUSIC ASSOCIATION since 1958.  Declaration of Tammy Genovese, Chief Executive Officer of applicant ("Genovese Declaration"), ¶ 4 attached to response filed February 13, 2008; Declaration of Russell P. Beets, ¶ 6, attached to response filed February 13, 2008.  In addition, the number of individual and organizational memberships in applicant's association exceeds 6000.  Declaration of Kristen L. Fancher ("Fancher Declaration"), ¶ 3, attached to response filed May 14, 2007. Applicant has also presented for over 43 years the Country Music Association Awards recognizing professional excellence, which from 2001-2007 had approximately 36 million television viewers each year, and since 1972 it has sponsored the Country Music Festival which has been annually televised since 1974.  Genovese Declaration, ¶ 10; Fancher Declaration, ¶ 7 and 8.

The record shows that in recent years applicant has increased its promotional activities in connection with the mark COUNTRY MUSIC ASSOICATION.  For example, from 2000–2007, applicant engaged in targeted advertising campaigns, spending approximately $1-3 million annually on print and television ads, trade shows, promotional events, and email campaigns.  Genovese Declaration, ¶ 5 and 7.  During that same time period, applicant earned over $92.8 million in revenues.  Genovese Declaration, ¶ 8.

Applicant has also made use of the Internet to promote its mark.  Applicant has expended resources to ensure that when Internet users type the phrase "Country Music Association" into an Internet search engine, the first hit that appears on a search results list is a link to the home page of applicant's website, which displays applicant's mark COUNTRY MUSIC ASSOCIATION.  Genovese Declaration, ¶ 8 and attachments to "Item 8 Search Engine Results."  In addition, applicant's www.cmaworld.com website which promotes applicant's association services had over 15 million hits in 2007.  Genovese Declaration, ¶ 8.

Finally, although the consumer survey conducted by Dr. Ford was submitted in connection with the issue of genericness, the acquired distinctiveness of the term COUNTRY MUSIC ASSOCIATION among the relevant purchasing public can be inferred from the results.  By categorizing the term COUNTRY MUSIC ASSOCIATION as a brand name, 85% of the respondents were saying, in effect, that they associated the term with the product or services of only one company.

Thus, in view of applicant's long and continuous use, significant sales and advertising expenditures, substantial publicity in the national media, and brand name recognition among consumers, we find that applicant has established acquired

distinctiveness of COUNTRY MUSIC ASSOCIATION as its mark for the recited services.

II. *Application Serial No. 78901341 -- Disclaimer Requirement*

The examining attorney has refused to register the mark in this companion application absent a disclaimer of the wording COUNTRY MUSIC ASSOCIATION, arguing that this phrase is generic. For the reasons discussed in connection with Application Serial No. 78906900, we find that the phrase COUNTRY MUSIC ASSOCIATION as a whole is not generic; however, the word ASSOCIATION is. Accordingly, we affirm the refusal to the extent that the mark may not be registered without a disclaimer of ASSOCIATION.

**Decision:** The refusals to register are affirmed only to the extent that the term ASSOCIATION in both marks is generic. Applicant is allowed until thirty (30) days from the date of this decision to submit to the Board, in connection with each application, a disclaimer (in proper form) of the word "association," in which case this decision will be set aside and the applications will be forwarded to publication.[8] *See* Trademark Rule 2.142(g).

---

[8] A proper disclaimer reads as follows: "No claim is made to the exclusive right to use ASSOCIATION apart from the mark as shown."